**In re Grand Jury Proceedings Witness: Mary AGOSTO, et al.**

**No. CV–LV–82–9, HEC.**

United States District Court, D. Nevada.

Jan. 4, 1983.

---

Dominic P. Gentile, David Z. Chesnoff, Las Vegas, Nev., for witness Charles Agosto.

Lawrence R. Leavitt, Sp. Atty., Las Vegas Strike Force, U.S. Dept. of Justice, Lamond R. Mills, U.S. Atty., Las Vegas, Nev., for the Government.

## DECISION

CLAIBORNE, Chief Judge.

This matter is before the Court on a Motion to Quash Grand Jury Subpoena ad Testificandum or, in the alternative, for a Protective Order. Charles Agosto, Movant, requests that the subpoena ad testificandum, issued by the Special Grand Jury impaneled May 18, 1982, be quashed or alternatively, that the Court prohibit, by protective order, the Movant being interrogated by the members of the Grand Jury or any representative of the Department of Justice as to any matter, which testimony might be included in evidence presented to the Special Grand Jury for use in any contemplated indictment of Movant's father, Joseph Agosto. Movant asserts that the Court should allow the requested relief based upon the U.S. Constitution and certain amendments thereto, federal legislation, affidavits, exhibits, and common law principles which Movant argues protect him from being coerced to testify against his father in any proceeding. In addition, Movant takes the position that his religious beliefs compel him to refuse to be coerced into offering testimony which could be used in a prosecution of his father. In a hearing on this motion, Movant offered the testimony of a Rabbi and a Catholic priest to substantiate this claim. Furthermore, Movant argues that should he be forced to offer testimony against his father, irreparable psychological harm will befall him. Movant offered the testimony of several experts in psychology to substantiate this claim as well. By affidavits, Movant has sought to support the instant motion by notifying this Court that this is the third occasion in the past 18 months that federal prosecutors and a Grand Jury in the District of Nevada have subpoenaed children to testify against their parents, who are targets of an investigation, for the purpose of questioning these children about matters pertinent to the investigation of their parents.

Both Movant and the Government have filed points and authorities in support of their respective positions. Movant has not only provided an extensive discussion of the law, but has drawn the Court's attention to numerous policy arguments in regard to this matter. Because the issues presented to the Court are of such an interesting and important nature, and because the law in

this area is relatively undeveloped at the present time, this Court will endeavor to examine the requested motion in depth both as to law and policy.

The arguments of the parties can be summarized as follows. For analysis, Movant's argument can be divided into three categories of "harm" which he urges the Government's subpoena, if enforced, would perpetrate upon him. First, Movant urges that the harm done to him as an individual, both physically and emotionally, renders the Government's actions an impermissible invasion upon his personal autonomy and religious beliefs. Second, Movant argues that the implications to his family from such a coercion are permanently detrimental. And finally, Movant argues that the damage to society as a whole should such a practice be permitted far outweighs any goal that the government is trying to reach by requiring such testimony by family members against one another.

In regard to the first argument, in his Points and Authorities, Movant states that an individual's happiness and fulfillment within the family unit are valuable goals which should be protected. In this case, Charles Agosto feels that being required to testify against his father, or in the alternative, to face penalties for refusing to do so, would cause him such damage to his mental, physical, and emotional health, in addition to damaging his relationships with the members of his family, that relief by the Court is clearly warranted. Movant feels that as the child of his father, he is and will always remain emotionally indebted to him as long as he lives. To disavow this debt would cause untold suffering to him as an individual, not to mention as a member of his family unit. Movant cites the case of *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) for the proposition that the Supreme Court of the United States supports the liberty interest of the individual in pursuing the privileges of marriage, raising a family, and establishing a home. Furthermore, Movant feels that the reciprocal communication inspired within and fostered by the family unit is a quality which is necessary for proper rela-

tionships within the family, as well as a proper relationship with society itself. The respect for confidence and the growth of mutual trust are felt by Movant to be qualities which benefit society as a whole. Furthermore, Movant feels that loyalty and confidentiality within the parent-child relationship is just as vital to sustaining that relationship as is the confidentiality within the marital relationship. In both instances, the cohesiveness and harmony of the family is at stake.

In this case, Movant urges that the First Amendment of the United States Constitution guarantees that Movant may freely exercise his religion. Movant is a Roman Catholic, and urges upon this Court that he subscribes to the tenets of the Catholic faith. Specifically, Movant feels that his religious beliefs bind him to the commandment which requires him to "honor thy father and mother." Thus, he argues that the government cannot infringe upon his free exercise of this right. In keeping with Movant's religious views, he argues that if a child is forced by the government to disobey this commandment, in effect, this would be an act which would likewise incriminate the child, in addition to the parent. Movant refers to the Canons of the Roman Catholic Church, which prohibit a child's being forced to testify against its parent in ecclesiastical tribunals. Movant also refers to the Jewish religious tradition as a basic substantiation of this idea. The free exercise clause, Movant argues, has been revered and upheld by the courts of this land, even at the expense of other important interests. Movant cites *Wisconsin v. Yoder* as providing that only the most important of interests, crucial to society, can outweigh the individual's right to the free exercise of his religion. *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). Movant is careful to note that allowing the free exercise of religion in this case would not undermine the Establishment clause. In analyzing his rights under the Free Exercise clause, Movant asserts that the First Amendment protection is given a supportively broad inter-

pretation in order to prevent the suppression for which it was designed. Movant vigorously asserts that the government's efforts to coerce him to testify against his father, in contravention to his religious beliefs, is an intrusion of the caliber and magnitude which the Amendment was enacted to prevent. Movant cites the Ninth Circuit case of *Bursey v. United States,* 466 F.2d 1059 (9th Cir.1972) for the proposition that First Amendment rights are foremost in the rights provided constitutional protection. The *Bursey* case, as Movant points out to the Court, clearly makes First Amendment rights applicable to grand jury proceedings. *Id.* at 1082. According to Movant, the government has not carried its burden of proving that the intended violation of Movant's First Amendment rights is essential and necessary to the achieving of the government's goals in this matter. Citing *Bursey,* he urges that the government has not proved that "the means of obtaining the information are not more drastic than necessary to forward the asserted governmental interest." *Id.* at 1083.

An individual's right of privacy is also urged as a factor to be strongly considered by this Court. Movant argues that under the principle of natural law, there is a limit to the restrictions which can be placed upon an individual by the government. Citing *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), he points out that the Supreme Court has recognized certain rights as "so rooted in the traditions and conscience of our people as to be ranked fundamental." It is seriously urged that the rights of the individual in this matter are to be looked at by the Court as fundamental in nature.

Movant next asserts that he is entitled as an individual to have the subpoena quashed if he will suffer mental or physical damage as a result of the coerced testimony. Movant cites *In re Loughran,* 276 F.Supp. 393 (C.D.Ca.1976) to support this position. Furthermore, Movant cites a decision of this Court, in *In re Grand Jury Proceedings, Witnesses: Robert Stella, et al.,* CV–LV–82–71, HEC (D.Nev., May 5, 1982). At the evidentiary hearing incident to the instant motion, Movant elicited testimony from a psychiatrist, a research psychologist, and Movant's treating psychologist, who were all questioned about the effect that coerced testimony would have, not only upon the family unit, but upon the Movant himself. The treating psychologist, Dr. Joan Owen-Smits, had performed extensive psychological profile testing on the Movant. The results of these tests are included as exhibits to the motion before the Court.

In addition to the harm that Movant asserts he will suffer as an individual, he also states that the coerced testimony would have an extremely deleterious effect upon his family. He stresses that Western civilization considers the family unit to be inviolable and that the parent-child relationship holds a place of sanctity not only in philosophy, but in history, as well. It is urged that the family is the "cradle of civilization" in which the child first learns his own identity through his relationship with the members of his family unit. The stability of those relationships is carried over into the stability of the child's relationship to society as a whole. In addition, Movant urges that throughout history, society has recognized the human family as an autonomous unit whose sanctity and harmony is revered. Turning to an analogy of the husband and wife relationship, to which courts have provided some degree of protection from coerced testimony, the Movant contrasts this relationship to the parent-child relationship. It is urged that while the husband-wife relationship is voluntary and capable of dissolution, the parent-child relationship is life-long. The Movant urges that society's interest in protecting this blood relationship is great, perhaps even greater than society's interest in keeping the spousal relationship free from intrusion by the state. And even in the absence of a blood bond, the sanctity of the tie between parent and child is still worthy of protection. Movant cites *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977) to support this proposition.

It is also urged that the parent-child relationship is one which is not limited to the minority of the child. The relationship lasts during the entire lifetimes of the individual participants. In addition, the relationship itself is ongoing from generation to generation and, thus, is an inextricable part of the history and fabric of society as a whole, linking the individual both to his past and future.

Movant urges that a central aspect of the cohesiveness of the relationship between parent and child in the context of the family is the reciprocal communication between the two, inspired by both confidentiality and loyalty, on which the relationship is based. Movant contends that society is presently experiencing a breakdown in the parent-child relationship, resulting in juvenile delinquency and crime. It is urged that in a cohesive family unit in which the members communicate openly with each other, children of such a family tend to be more well-adjusted, and delinquency is more infrequent. In the modern day, in which it is opined that the family, as a functional unit in society, is becoming obsolete, it is urged that society's interest in protecting the family unit is especially compelling. Movant argues that the family relationship cannot be protected in the absence of an expectation of privacy in intrafamilial communications in light of the sanctity of the family unit and its component relationships. He urges that in the complexities of life in the modern world, the importance of a cohesive family unit is inestimable. And he points out that the insularity of the family increases in response to the stresses of contemporary life in an ever-burgeoning population. Thus, the relationships within the family unit become more important.

Finally, Movant points out that the family unit itself has been afforded the right of privacy by the United States Supreme Court, and thus deserves protection from harmful intrusion by the state which violates that right. *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). This right of privacy is deemed to emanate from the penumbra of constitutional rights, as discussed in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Movant argues that should the rights of privacy which spring from the Constitution not be protected against state intrusion, then a totalitarian or Hitlerian society will result, in which the right of privacy, inherent in the family unit, is completely ignored where it is deemed inconsistent with the state's purposes. It is urged that both the personal and familial sacrifice is far too great to justify the government's demand that testimony be given by one family member against another. On the basis of these arguments, Movant urges that this Court grant his Motion to Quash the subpoena ad testificandum, or in the alternative, issue a protective order prohibiting Movant from being interrogated as to any matters which could be included in evidence for a contemplated indictment of Movant's father.

## I. *The Origin and Scope of Testimonial Privileges:*

Testimonial privileges protecting communications between two individuals are exceptions to the rule that all relevant evidence is admissible in judicial proceedings. One commentator has suggested that:

> [t]heir creation represents a judicial or legislative determination that preserving and fostering certain relationships outweighs the potential benefit to the judicial system of compelled disclosure. Typically, the privileged relationship is one which requires confidentiality to function optimally. By protecting communications made in confidence, a privilege both preserves the right of privacy of the instant relationship and encourages open communication between others involved in the same type of beneficial association.

Comment, *The Child-Parent Privilege: A Proposal,* 47 Fordham L.Rev. 771 at 772 (1978–79). Testimonial privileges for communications between attorney and client, husband and wife, priest and penitent, and physician and patient have become a recognized part of American law. In addition, there has been an expansion of the privilege

protecting communications between professionals and lay persons in a wide variety of fields. Oddly enough, confidential communications between family members have not yet been afforded the status of a testimonial privilege. This is, perhaps, an anomaly in light of the high regard which the Supreme Court of the United States has placed on the sanctity of the family as an autonomous social unit. In *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977), the Supreme Court stated:

> Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this nation's history and tradition.

While the marital privilege has been under attack over the past few years, it remains viable in American courts today. One commentator has noted that:

> The principle effect of these derogations of the privilege has been legislative and judicial restriction, rather than complete abrogation. Similarly, exceptions to the privilege against adverse testimony are being carved out with increasing frequency, particularly at the federal level. Nevertheless, the marital privileges, in one form or another, remain an integral part of most state evidentiary codes. Their continued vitality indicates a legislative and judicial determination that invading the privacy of the marital relationship is simply too high a price to pay for the possible benefits of compelled disclosure.

Comment, *The Child-Parent Privilege: A Proposal,* 47 Fordham L.Rev. 771, 778–79 (1979).

The attorney-client privilege seems to enjoy a continued, unquestioned recognition in the law. Likewise, the psychotherapeutic privilege between a professional and his patient seems to command the same viability. The rationale for this continued viability is the idea that confidentiality is a necessary prerequisite to the maintenance of such a relationship. *Id.* at 779. In regard to the psychotherapeutic privilege between a professional and his patient:

Many states have no general psychotherapist-patient privilege, but have specific privileges solely for psychologists. A few states have separate privileges for psychiatrists. Other groups that have either been included under a general psychotherapist-patient privilege or have won privileges of their own include social workers, marriage and family counselors, school psychologists, teachers, and guidance counselors. The same rationale applies to all: a guarantee of confidentiality is necessary in order for the professional to provide satisfactory and socially beneficial care.

*Id.* at 780. The marital and psychotherapeutic relationships have common elements. Both relationships are socially desirable. Confidential communications occur in each. And the expectation that such confidences will remain undisclosed is inherent in both relationships. This element of privacy and confidentiality is essential to the satisfactory maintenance of these relationships. *Id.* It has been noted that the parent-child relationship is also similar to these two privileged relationships:

> Upon examination of the relationship between parent and child, certain similarities to both of the above relationships emerge. Ideally, the parent-child relationship encompasses aspects of the marital relationship—mutual love, affection, and intimacy—as well as elements of the relationship between psychotherapist and patient—the parent providing the emotional guidance and the child relying on him for help and support. Because parental influence is probably the most important factor in a child's development, society has a vital interest in fostering this dual affectional and therapeutic relationship between parent and child. As in the marital and psychotherapeutic relationships, optimal child-parent relationship cannot exist without a great deal of communication between the two. Such a relationship would be characterized by a free flow of highly personal information from child to parent .... Thus, the promise of confidentiality is a necessary

prerequisite to the satisfactory maintenance of the child-parent relationship, just as it is to the presently privileged marital and psychotherapeutic relationships.

*Id.* at 781. The Supreme Court has recognized the importance of the relationship between parent and child. The Court noted in *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977) that "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children . . . ." In *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972), the Court noted that "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." While a child's relationship to society is affected by diverse influences, perhaps the most important influence is the child's relationship to his family. If the relationship is unsatisfactory, the effect could be that the child is incapable of adjusting to the larger world and society as a whole. The importance of the child's relationship to his family cannot be underestimated:

> Whether the familial influence is positive or negative depends to a great extent upon the quality and amount of interaction between parent and child . . . . Positive family interaction, however, plays a more significant role in the prevention of delinquency and the promotion of a well-adjusted child. It is primarily for this reason that society has such a strong interest in fostering open communication between parent and child. Studies demonstrate that children raised by parents who emphasize two-way communication and who involve the children in family decisions are well-adjusted and have a positive self-image.

Comment, *The Child-Parent Privilege: A Proposal,* 47 Fordham L.Rev. 771 at 782–83. Open communication, then, has a therapeutic value in the relationship between family members. The child's ability to trust his parents and rely on them for help and advice finds its roots in an atmosphere of open communication and confidentiality. In urging the recognition of a parent-child testimonial privilege, it is argued that:

> In his home, more than anywhere else, the child should be encouraged to communicate freely and should be made to feel that what he has shared with his parents in confidence will not be disclosed to outsiders. Without the promise of confidentiality, however, child-parent interactions will necessarily be inhibited and the parent will be unable to provide salutary guidance and support. At a time when the demise of the family is being both predicted and decried, it seems anomalous to deny child-parent communications the same protection as is granted to communications arising out of other socially beneficial relationships.

*Id.* at 785–86.

In contrasting the marital privilege against adverse spousal testimony to the confidential communications privilege characteristic of psychotherapeutic and other professional relationships, it is noted that the rationale behind these privileges is somewhat different:

> The rationale of preserving family harmony and preventing dissension is generally applied only to the marital privilege against adverse testimony and not to the confidential communications privilege. Yet, it would seem to be an equally valid justification for both. Although the confidential communications privilege is not primarily designed to exclude adverse testimony, from a practical standpoint such a privilege is most likely to be invoked when the communication sought to be disclosed is in some way incriminating to the communicating party.

*Id.* at 787. A recognition of a parent-child privilege could be based on *both* of these

rationales, in that, it is necessary to protect and preserve family harmony and prevent dissension, and it would prevent disclosure of confidential communications which in some way incriminate the communicator. It is viewed that:

Revelations of these intimate communications may have a very negative impact upon a pre-existing family relationship. In fact, the most salient effect of both the marital confidential communications privilege and the child-parent privilege is not so much that they encourage open communication (although this may well be true in some instances), but that they protect the confidentiality of a communication once it has been made. If it is accepted that the state and society in general have a strong interest in preserving and fostering the child-parent relationship, then it must be recognized that compelling disclosure of a child's confidences runs directly counter to this interest. What the privilege protects is not only the expectation of privacy, that is, the encouragement of confidential communications, but the privacy of the family relationship itself.

*Id.* at 788. It can certainly be argued that compelling disclosures of communications between parent and child could be just as repugnant as compelling disclosure of communications between husband and wife:

One of the harshest critics of the adverse testimony privilege has suggested that the repugnancy rationale would make more sense if the privilege encompassed the testimony of parents, children, and siblings, as well as that of husband and wife. Although the repugnancy rationale has been dismissed by critics as sentimental, speculative, and not sufficiently important to overcome the needs of the state and litigants for disclosure of relevant evidence, it is suggested that there is a great deal more than indecorum involved when disclosure of intimate family confidences is compelled. At stake is no less than the right of a family to maintain its inviolability and integrity. At the least, the compelled parental disclosure would result in strained relations,

not only between the child and the parent who revealed his secrets, but among the entire family. The extent and duration of the breakdown in intrafamilial interaction will vary from family to family, depending upon such factors as its inherent stability, the age of the child, the subject matter of the communication disclosed, and the type of proceeding in which testimony is given. In almost every case, however, some degree of harm seems inevitable, and in many families, future communication may be deterred.

*Id.* at 788–90. (See footnote 165, page 789, in which it is noted:

Family dissension may be even more severe in criminal, delinquency, or grand jury investigations where the child is suspected or accused of involvement in criminal activity and parental disclosure may directly incriminate him. (citations omitted).

In a law review article written by Daniel Coburn in 1969, the recognition of a parent-child privilege for confidential communications was also addressed. *See* Coburn, *Parent-Child Communications: Spare the Privilege and Spoil the Child,* 74 Dickinson L.Rev. 599, (1969–70). The author discussed the historical justifications for the privilege, as well as offering policy arguments beneficial for a contemporary analysis of the issue. Coburn discussed testimonial privileges in general, and he noted that there was a privilege against self-incrimination in early Jewish law. Some Jewish scholars regarded the prohibition against self-incrimination as linked to the Biblical rule that excluded a kinsman from testifying in a suit involving another kinsman. The rationale for this was that if a person cannot testify against his brother, then he should not testify against himself. *See,* Mandelbaum, *The Privilege Against Self-Incrimination in Anglo-American and Jewish Law,* 5 Am.J.Comp.L. 115 (1956). At present, a privilege for confidential communications between parent and child is presently recognized in continental Europe. *See* Note, *The Husband-Wife Privilege of Testimonial Non-Disclosure,* 56 Nw.U.L.

Rev. 208 (1961). In Bodington's translation of the French Civil Code, article 268, it is provided that "no one can be summoned as a witness if he is a *blood relation, or a relative by marriage in direct line* . . . of one of the parties . . . ." *Id.* at 211, n. 16. (emphasis added). This privilege not to inform on family members extends, therefore, in criminal matters to "[f]ather, mother, grandfather, grandson, granddaughter, brothers, sisters, brothers and sisters-in-law, and the husband and wife of the accused, even if divorced." *Id. See* Bodington, *French Law of Evidence,* 118 (1904); Quick, *Self-Incrimination Under the Uniform Rules of Evidence,* 3 Wayne L.Rev. 1 (1956). There are presently three categories of privileges recognized in American law. The word "privilege" itself, a derivative of the Latin phrase "privata lex", is described as "a prerogative given to a particular person or class of persons." Coburn, *supra,* at 601–02. These three categories of privileges are: 1) privileges to protect the rights of individuals, 2) privileges to protect the maintenance of the government, and 3) privileges which express the law's concern for the security of an individual as a participant in a relationship which is considered by the state to be important and in need of protection. The nature and value of the relationship is considered to be important as an end in itself. *Id.* at 602. While a privilege is an exception to the general rule that every man must give his evidence in court, as noted *supra,* certain ancient societies have recognized that this was not always a superior goal. Slovenko notes in his article, *Psychiatry and a Second Look at the Medical Privilege,* 6 Wayne L.Rev. 175 (1960):

> [T]he early Roman law recognized the rule of *testimonium domesticum* which provided that parents, children, patrons, freedmen, and slaves were prohibited by the *Lex Iulia* from being compelled to give testimony against each other. The rationale underlying this privilege was not directly related to self-incrimination but rather against the corruption of the intrafamilial relations which would ensue by making uncertain and suspicious what was instinctively assumed to demand the

most unrestricted confidence or *uberrima fides,* the sanctity of the family based on mutual fidelity. Thus, it is not surprising that the specific policy of *uberrima fides* was consistently deemed superior to the general policy of the law, i.e., the correct settlement of controversies or the punishment of offenders.

*Id.* at 181. In the realm of the husband-wife privilege, one scholar has noted that testimony of one spouse which incriminates the other would be repugnant to society, as akin to self-incrimination. *See,* Sutton, *Admissibility in Tennessee of Spouses' Testimony Concerning Their Private Affairs,* 3 Vand.L.Rev. 298, at 298–99. The danger of foreclosing the use of privileges is discussed in detail by Louisell in his article, *Confidentiality, Conformity, and Confusion: Privileges in Federal Court Today,* 31 Tul.L.Rev. 101 (1956). He notes:

> [T]o conceive of the privileges merely as exclusionary rules, is to start out on the wrong road and, except by happy accident, to reach the wrong destination. They are, or rather by chance of litigation may become, exclusionary rules; but this is incidental and secondary. Primarily they are a right to be let alone, a right to unfettered freedom, in certain narrowly prescribed relationships, from the state's coercive or supervisory powers . . . .

*Id.* at 110–11. Thus, the recognition of testimonial privileges should not be deemed as merely a device which frustrates the effective administration of justice. Rather, a broader look at the rationale and policy of the issue should be undertaken. Louisell notes further:

> It is the historic judgment of the common law, as it apparently is of the European law and is generally in Western society, that whatever handicapping of the adjudicatory process is caused by the recognition of the privileges, it is not too great a price to pay for secrecy in certain communicative relations . . . .

*Id.* at 110.

The attorney-client privilege is presently recognized in all jurisdictions of the United

States either as part of the statutory or common law. This privilege assures that clients will receive adequate representation by feeling that they can disclose fully to their attorney all pertinent information, in the milieu of respected confidentiality. The confidential nature of the relationship is that factor which the law deems worthy of protection. Society has recognized that the confidentiality of an effective attorney-client relationship is so important to the administration of justice itself that information which could otherwise be coerced will be permitted to be withheld by a party, if such information is a part of the confidential communications between attorney and client. As noted in *Pearse v. Pearse*, 1 DeG. & Sm. 28–9, 16 L.J. Ch. 153 (1846):

> Truth, like all other good things, may be loved unwisely—may be pursued too keenly—may cost too much. And, surely the meanness and the mischief of prying into a man's confidential consultations with his legal advisor, the general evil of infusing reserve and dissimulation, uneasiness, and suspicion and fear, into those communications which must take place, and which, unless in a condition of perfect security, must take place uselessly or worse, are too great a price to pay for the truth itself.

There can be little doubt that there is a balancing process which must be undertaken. Full adjudication of all the issues in a lawsuit, with disclosure of all the relevant facts, is an important goal, to be sure. But likewise, the confidentiality inherent in certain properly functioning human relationships is also an important goal for society to recognize and protect. In another article written by Louisell, he comments upon the rejection of the physician-patient privilege, which he feels is:

> the function of a philosophy which deems state processes *per se* valuable and significant and individual interests *per se* subordinate, a philosophy whose devastating effects on human freedom often have been demonstrated by history ancient and recent, and are being demonstrated today.

Louisell, *The Psychologist in Today's Legal World: Part II,* 41 Minn.L.Rev. 731, 750 (1957).

In Coburn's article, the efficacy of a parent-child testimonial privilege is discussed in great detail. He considers both the utility and practicality of recognizing such a privilege. Coburn feels that continued and open communication between parent and child is of critical importance in maintaining the parent-child relationship. He argues that, "it reasonably follows that the basis for creating an acceptable child-parent privilege must include the concept of fostering a therapeutic relationship as the desired goal of the privilege. Coburn, *supra,* at 615. In discussing the relationship between parent and child, he notes:

> Initially, it should be recognized that the home and family constitute the first social organization into which a child is brought. The sanctity, serenity, freedom, and organization of that unit will have a marked effect upon the personality and development of the child and upon his ability to become an effective and operative part of the community. A child first learns who he is through his relationship with his family. His mental and moral growth thereafter depend upon the stability of personal relationships, which only the family presently appear able to provide. The failure and decay of the family has a corresponding effect on our society as a whole.

*Id.* at 116. *See also,* Furlough, *Youthful Marriage and Parenthood: A Threat to Family Stability,* 19 Hast.L.J. 105 (1967). Manley, in his law review article, *Patient, Penitent, Client, and Spouse in New York,* 21 N.Y.S.B.A.Bull. 288 (1949), supports recognition of a privilege where there is:

1) Instinctive revulsion against the betrayal of a confidence.

2) A sense of compassion even for a transgressor, *i.e.* a feeling that there should be for every man some sanctuary beyond the reach of society's law where he may safely confide his guilty secrets in an attempt to ease his troubled spirit.

3) A sense of fair play related to the Norman view of a lawsuit as a species of contest or sporting event wherein it would be too easy, and hence unfair and against the 'rules of the game,' to hound a man to doom by convicting him through the lips of his own intimate friends, family, or medical, legal, or spiritual advisors.

4) A desire to preserve the function of certain socially valuable relationships even at the cost of occasional suppression of the truth and injustice in such, presumably few, particular cases.

5) A feeling of individual and professional pride and self-importance in being the inviolable repository of others' secrets.

*Id.* at 290. Coburn feels that a parent-child privilege would more than adequately satisfy these requirements. Coburn, *supra,* at 618, n. 121. Some scholars can see no logical distinction between the recognition of a marital privilege and the recognition of a parent-child privilege. In 1934, Connor wrote:

The courts seem to have been dominated by a desire to preserve the marital state free from the dangers that might accrue if the law would permit one spouse to give testimony against the other. But if this represented the controlling desire and reason for the [marital privilege], it is strange that the common law did not extend this safeguard to the other family relations so as to disqualify all members of the party's family. Is not the security and peace of the family just as much jeopardized by the damaging testimony of the son or daughter of the defendant as by that of the spouse? Yet the common law did not extend the disqualification to the son *qua* son or the daughter *qua* daughter or the other family relations. In this respect the common law did not receive its inspiration from the civil or ecclesiastical law.

Connor, *The Qualification of Defendant's Spouse as a Witness in Criminal Cases,* 9 Notre Dame Law. 272 at 274 (1934).

Another standard to be applied in determining whether a privilege should be recognized is that propounded by Wigmore. The Wigmore test provided:

1) The communication must originate in a *confidence* that it will not be disclosed.

2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

3) The *relation* must be one which, in the opinion of the community, ought to be sedulously *fostered.*

4) The injury that would inure to the relation by the disclosure of the communication must be *greater than the benefit* thereby gained for the correct disposal of litigation.

8 J. Wigmore, *Evidence* § 2285 (McNaughton rev. 1961) (emphasis in original). Coburn discusses the application of the Wigmore test to the proposed parent-child privilege. He notes:

It is difficult to imagine a relationship which, by its inherent nature, spawns communications of a confidential nature with a greater degree of frequency. It is reasonable to conclude that, in light of the natural and continuing characteristic of the child-parent relationship, Wigmore's first requirement that the communication originate in a confidence is satisfied.

Coburn, *supra,* at 623. He thus concludes that the communication between parent and child does originate in the confidence that it will not be disclosed. As to whether this confidentiality is essential to the maintenance of the relationship between parent and child, he concludes:

It seems more realistic to believe that a child's knowledge that his parents will either voluntarily or involuntarily disclose confidential discussions would seriously hinder the child's willingness to confide in his parents. Where the possibility of disclosure permeates any conversation between a child and his parent, the denial of the benefits of a privilege is not too far removed from the denial of the benefits of parents.

*Id.* at 624–25. Coburn dismisses the third requirement of Wigmore's test, summarily

noting that it can hardly be argued that the parent-child relationship is one which society has a great interest in fostering. The fourth component of Wigmore's test presents a more difficult problem in analysis, because this component requires a balancing between the benefit to justice which arguably occurs from forced disclosure as opposed to the injury to the parent-child relationship. Discussing this aspect of the test, Coburn notes that the breakdown of the trust between parent and child in their confidential relationship will cause the child to view the entire legal system suspiciously. *Id.* at 626. Furthermore, the parents themselves might lose respect for the legal system, if forced to testify against the child. Coburn is careful here to note the effect that this would have upon the legal system:

> There are two other courses of conduct open to the parent upon his being called to testify against his child. Both of these alternatives may be more debilitating to the entire legal system than any of the previously discussed factors. First, the parent may refuse to testify and, therefore, be subject to contempt proceedings. A second alternative is for the parent to deliberately lie and thereby assume the risk of subsequent criminal prosecutions for perjury .... The effect of such perjurous testimony on a child who has already performed antisocial conduct, can only be a feeling that the penalties of the system can be avoided by further unlawful conduct. Thus, a child can conclude that two wrongs do make a right. Instead of rehabilitating the juvenile, the juvenile court system might cause the child to resent the system itself, to resent the fact that a parent might have revealed the child's incriminating statements, to become prematurely aware that sometimes crime *does* pay, and finally, to possibly bring about the commission of a perjury by an otherwise innocent person.

*Id.* at 628–29. Quick, in his article, *Constitutional Rights in the Juvenile Court,* has noted that "if you deprive the juvenile of his liberty without 'due process' you are also curtailing the constitutional rights of his parents. For under our system the parent's liberties are inseparable from those of

his children. Quick, *Constitutional Rights in the Juvenile Court,* 12 How.L.J. 76 at 77 (1966).

It is this Court's opinion that, indeed, a parent's liberties are inseparable from those of his children, and furthermore, that a child's liberties are inseparable from those of his parents. Bridgman has also recognized that coercing testimony from a parent against his child would, in point of fact, place parties in a posture of committing perjury to protect one another:

> The law's handling of this huge segment of [social conduct] is beset with anachronisms, inconsistencies, evasions, and meaningless rituals. Perjury is invited. Reconciliations are thwarted. So consuming is its passion for facts that the law neglects the realities of interpersonal adjustments in a [family].

Bridgman, *The Lawyer and the Marriage Counselor Pari Pass v. Partners in More Effective Service to Ailing Marriages,* 4 Kan.L.Rev. 546 at 549 (1956). It would seem, then, that requiring or yet coercing testimony within the realm of the family in all possibility could be a complete exercise in futility. But in addition, it would amount to the perpetration of a great injustice to the sanctity of confidential relationships within the family unit.

In considering the possibility of "inviting perjured testimony", one commentator has suggested that privileges were originally enacted to prevent courts from being subjected to such testimony:

> Consider that a wife called to testify against her husband is faced with three alternatives: she can refuse to testify and be subject to contempt proceedings; testify, and possibly condemn her husband, or lie and accept the risk of prosecution for perjury. A consideration of this trilemma makes manifest the protection [of the relationship] and [natural] repugnance considerations, and also suggests the possibility that the courts may have drawn the privilege in the interests of protecting themselves from perjured or colored testimony.

*See* Note, *The Husband-Wife Privilege of Testimonial Non-Disclosure,* 56 Nw.U.L.

Rev. 208 at 210 (1961). Louisell substantiates this view, as well. He notes that there is "the gravest temptation to perjury by the holder of the secret. This is apparently why in the legal thought of a number of European countries, emphasis is placed upon the moral importance of refraining from coercion of witnesses as matters of conscience. Such coercion, in the face of conflicting concepts of loyalty and duty, is considered to be productive of perjury." Louisell, *The Psychologist in Today's Legal World: Part II,* 41 Minn.L.Rev. 731 at 750 (1957). Louisell also noted that the benefits in the administration of justice were "overbalanced by: (1) the inducement to perjury inherent in such attempts, and (2) the harm to the human personality, and hence, to freedom, in governmental forcing of a serious conflict of conscience." *Id.* Ascertainment of the truth, then, while an important goal, is not the only important goal. And indeed, if a parent-child privilege is foreclosed, the truth may yet remain elusive and even just as unattainable, in light of the perjury which could take place if such testimony is coerced.

In examining Wigmore's fourth criterion for the recognition of a testimonial privilege, then, the expected benefit to justice, used as a rationale for a bar of the privilege, is perhaps illusory. Coburn expresses that Wigmore's fourth question as to whether forced disclosure causes greater injury to the parent-child relationship than the expected benefit which could accrue to society, should be answered in the affirmative. He states:

> While compelling parental disclosures *may* afford the court the opportunity to base its decision on a limited amount of additional facts . . . . it is submitted that to totally deny a child the opportunity to claim the natural privilege involved in a parent-child relationship is to "win the battle and lose the war."

Coburn, *supra,* at 632.

II. *Constitutional Law affording protection for the Family Right of Privacy:*

The concept of an individual's right of privacy has developed into an important constitutional doctrine over the last century. *See* Warren and Brandeis, *The Right to Privacy,* 4 Harv.L.Rev. 193 (1890). This right of privacy has been extended to the family unit itself, as well. One of the first sources to recognize privacy as a right in itself was a work by Cooley, which dubbed a violation of privacy as compensable in tort. Cooley, *Torts* (2d ed. 1888) at 29. In 1886, the Supreme Court in *Boyd v. United States* found a right of privacy in both the Fourth and Fifth Amendments. *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). Perhaps the broadest articulation of a right of privacy occurred in *Olmstead v. United States* in which Justice Brandeis, in his dissent, noted that "[The framers of the Constitution] conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928). Testimonial privileges have been regarded by courts as important safeguards of the right of privacy. *See Caesar v. Mountanos,* 542 F.2d 1064, 1067–68 (9th Cir.1976); *Lora v. Board of Education,* 74 F.R.D. 565, 574–76 (E.D.N.Y.1977); *United States ex rel. Edney v. Smith,* 425 F.Supp. 1038, 1042–44 (E.D.N.Y.1976), aff'd, 556 F.2d 556 (2d Cir.1977); *In re Lifschutz,* 2 Cal.3d 415, 431–33, 85 Cal.Rptr. 829, 839–40, 467 P.2d 557, 568 (1970). Because of the constitutional stature of the right of privacy, it can be argued that privileges foreclosing the forced disclosure of confidential communications may be viable, even in the absence of a statute. *See Caesar v. Mountanos,* 542 F.2d 1064, 1067–68 (9th Cir.1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1597, 51 L.Ed.2d 804 (1977); *In re Lifschutz,* 2 Cal.3d 415, 431, 85 Cal.Rptr. 829, 839–40, 467 P.2d 557, 567–68 (1970). In the landmark case of *Griswold v. Connecticut,* the right of privacy attained the status of a constitutional guarantee. In *Griswold,* the Supreme Court found a violation of a marital "zone of privacy", and thus held as unconstitutional a statute of the state of

Connecticut which legislated that the use of contraceptives was against the law. *Griswold v. Connecticut,* 381 U.S. 479, 485–85, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). The right of marital privacy and privacy within the family setting has been expounded upon in later cases, as well. See, *Carey v. Population Servs. Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (rights of minors to purchase contraceptives); *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (right to choose family living arrangements); *Planned Parenthood v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976) (right of single minor to be free to choose abortion in first trimester of pregnancy without state requirement of parental consent); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right to choose abortion during first trimester of pregnancy without governmental interference); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (individual's right to freely use contraceptives without governmental control); *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (right to view pornography in the home). *Griswold,* then, set the stage for finding certain communications within the family to be private and, therefore, worthy of a privilege.

In 1923, in the case of *Meyer v. Nebraska,* the Supreme Court expressed the view that, under the Constitution, the family is an autonomous unit which should be free of undue state interference. *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). There are two types of Supreme Court cases dealing with family autonomy. First, there are those cases which challenge the constitutionality of the intrusion by the state into the family structure or the definition of the family. *See Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (which held that a pre-removal hearing was not required when foster children living in a foster home for less than 18 months are returned to their natural parents); *Moore v. City of East Cleveland, supra,* (in which a

city housing ordinance was declared unconstitutional because it defined the family unit as confined to certain limited bounds and required that only a single family unit could live in a particular dwelling); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 22 L.Ed.2d 542 (1972) (which held that a state had no right to interfere with the rights of an unwed father in custody matters in the absence of a showing of neglect). The other category of Supreme Court cases dealing with family autonomy concerns the constitutional right to make certain decisions affecting the family unit. The right to marry has received constitutional protection. *See Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 58 L.Ed.2d 618 (1978) (statute declared to be an unconstitutional invasion upon the fundamental right of marriage which statute required unmarried individuals charged with the obligation to provide support of children not in their custody to obtain a court order approving a subsequent marriage); *see also Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (which declared a miscegenation statute an unconstitutional impingement on the fundamental right to freely marry). The right of procreation has received constitutional protection. *See Planned Parenthood v. Danforth,* as noted *supra; Cleveland Bd. of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (mandatory pregnancy leave held as an unconstitutional invasion of the decision to have a family); *Roe v. Wade, supra.* The right to use contraception has been afforded constitutional protection. *See Carey v. Population Servs. Int'l, supra; Eisenstadt v. Baird, supra;* and *Griswold v. Connecticut, supra.* And finally, the right to make certain decisions in the rearing of children has been afforded constitutional protection. *See Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (compulsory education statute held unconstitutional where it was deemed that the parental right of free exercise of religion by choosing to rear and educate their children in a certain manner outweighs the state's interest in compulsory education); *Pierce v. Society of Sisters,* 268

U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1923) (statute barring private education held an unconstitutional intrusion on the parental right to direct the upbringing of children); *Meyer v. Nebraska, supra* (statute barring the instruction of children in foreign languages held unconstitutional). These cases demonstrate that the Supreme Court has determined that there is a "private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed.2d 645 (1944).

 The realm of family privacy is not absolute, however. Where the state can show a compelling state interest facilitated by a regulation which arguably encroaches on the realm of family privacy, the statute will be upheld. *See Jacobson v. Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (which held that a state may enact a compulsory vaccination law). However, if the intrusion by the state into the realm of family privacy is great, then the state is required to make an even greater showing that the regulation facilitates the compelling state interest, and that, by comparison, the state's interest is the more important. *Roe v. Wade,* supra, 410 U.S. at 153–55, 93 S.Ct. 726–27. The competing interests of family privacy as opposed to the state's interests must be carefully weighed to determine which has greater value and should be given precedence. *Id.*

III. *Cases in which a Parent-Child Testimonial Privilege has been claimed:*

The parties in this case have both cited *In re Kinoy,* 326 F.Supp. 400 (S.D.N.Y.1970). In the *Kinoy* case, an attorney filed a motion to quash a federal grand jury subpoena served upon him to learn the whereabouts of his daughter. Kinoy claimed both an attorney-client privilege, as well as a parent-child privilege. Although the court denied the motion to quash, their decision was clearly limited to the specific facts before them. Kinoy argued that he should not be required to appear before the grand jury. The court countered this argument, noting that "with the rarest of possible exceptions, nobody is immune from such appearances

whether or not particular questions put by the grand jury to the witness who has appeared may give rise to valid claims of privilege." *Id.* at 401. In advancing this claim of an attorney-client privilege, Kinoy argued that in the past he had provided legal services for groups requesting enforcement of civil rights. Because some of his clients were "politically unorthodox," requiring his testimony before the grand jury would have a " 'chilling effect' upon First Amendment rights in that 'it will cause these groups to lose confidence' in him 'whether or not [he] is actually forced to betray legal confidences.' " *Id.* While recognizing that Kinoy was required to preserve the confidentiality of the attorney-client relationship, the court discussed the fact that attorneys must appear and give non-privileged testimony, where appropriate:

> Nothing in the First Amendment and nothing shown here indicates a need for totally immunizing him against grand jury subpoenaes .... [Attorneys] are obliged at the same time, not less than others, to give their non-privileged knowledge to the grand jury.

*Id.* at 402. Thus, even within the bonds of the attorney-client relationship, a witness who is part of that relationship cannot be excused from appearing altogether.

Although the court struck down Kinoy's claim that the attorney-client privilege barred his appearance before the grand jury, the court, in dictum, discussed in cautionary language the possibility of the potential abuse of the grand jury process:

> It is not to be questioned, of course, that any kind of exertion of governmental power against people or groups exercising First Amendment freedoms could exceed the limits of constitutionality .... and it could undoubtedly turn out to be the case if the powers of grand juries were perverted or carried to excess .... There has been a number of cases where the power of investigatory agencies has been limited because of the effects on First Amendment freedoms. (citations omitted).

*Id.* But returning to the facts before them, the court did entertain an analysis as to the degree of First Amendment infringement that was possible in a situation where such testimony is required, indicating that the issue was important to consider:

Giving the fullest possible reading to what Mr. Kinoy says and offers to prove about a "chilling effect" in this case, the relation between grand jury investigation and the infringement of First Amendment rights is so tangential and indirect that it cannot possibly justify forbidding the grand jury from even calling Mr. Kinoy as a witness. The investigation of the grand jury is designed to elicit from this witness narrow and clearly defined information, relating to a specific violation of the law, from a person likely to have the information, and in circumstances where "less drastic" means have failed.

*Id.*

Turning to Kinoy's assertion of a parent-child testimonial privilege, there can be little doubt that the court expressly rejected it. Speaking of the claim of such a privilege, the court noted:

[T]here is no such thing. All of us, whether as parents or children, may empathize over the imaginable prospect of being asked to incriminate those close to us. However, that is not necessarily the situation here.

*Id.* at 406. In a footnote, the court explained this comment, which was based on facts that can clearly be distinguished from the facts in the case at bar. When the Assistant United States Attorney was questioned by Mr. Kinoy's counsel, he indicated that Joanne Kinoy, the subject to the proposed grand jury questioning of her father, was not herself a "target" of the overall grand jury inquiry. *Id.* at footnote 11. The court, in dictum, took a hard-line stance, predicting that even *were* Ms. Kinoy the "target" of the grand jury inquiry, that this, alone, would not substantiate the claim of a parent-child privilege. But interestingly, the court did leave the issue open, in spite of these statements. In discussing that Ms. Kinoy was not a target of the investigation, the court noted:

... it would not in any event justify enforcement of the novel privilege now asserted .... It may be, of course, that a parent asked about possibly damaging things touching his child could invoke in good faith the privilege against incriminating himself.

*Id.* It could be argued that this dictum indicates that, while the court sees how compelling and worthy the relationship is between parent and child, it is bothersome that the privilege asserted by Kinoy is "novel". By pointing to a way around such a disturbing conclusion as forced testimony (i.e.—the invocation of a good faith "privilege against incriminating himself"), the *Kinoy* court minimizes its concern for the unnatural result brought about by such a divisive tactic. And again, the court indicated that in other cases with significantly different facts, the potential of grand jury abuse loomed as a spectre which would warrant close consideration of the facts of each case. Supporting a pre-trial determination of such important issues, the court noted that "[g]rand juries could, to be sure, serve as engines of harassment. There may be cases where facts appear at the threshold sufficient to require advance exploration of that sort of change." *Id.* at 407. It is this Court's opinion that such a case is here presented to us, and the preliminary exploration referred to by the *Kinoy* court is most appropriate on the facts before this Court.

Although there have been relatively few cases dealing with the constitutional protection of intrafamilial communications, the law has begun to emerge on the issue. While in *In re Lifschutz,* the Supreme Court of California afforded constitutional protection to physician-patient communications under a privacy rationale, (*see In re Lifschutz, supra*) oddly enough, the court in *In re Terry W* did not support a claim that communications between child and parent fell within a penumbral right of privacy. *In re Terry W,* 59 Cal.App.3d 745, 748, 130 Cal.Rptr. 913, 914 (1976). In the *Terry* case, statements made by a juvenile to his moth-

er which implicated him in a burglary were introduced at trial, despite counsel's objection. On appeal, it was argued that compelling the disclosure of these statements from child to parent was unconstitutional. Though the court felt that the grounds articulated for recognition of a parent-child testimonial privilege were "persuasive", the court found no such holding was required under the right of privacy afforded in the Constitution. *Id.* While the holding in *Terry* was that the penumbra of privacy surrounded only the husband-wife relationship, the court seemed to overlook the *Lifschutz* holding that the right of privacy extended to protect psychotherapist-patient communications. Likewise, the *Terry* court seemed to ignore the plethora of cases which, as progeny of *Griswold*, have recognized a right of privacy in the realm of the family. *See e.g. Cleveland Bd. of Education v. LaFleur, supra,* 414 U.S. 632, 639-40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52; *Roe v. Wade, supra,* 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147. Furthermore, the *Terry* court substantiated its holding by citing cases in which the Supreme Court declined a right of privacy; none of these cases dealt with privacy within the family structure. *In re Terry W,* 59 Cal.App. at 749, 130 Cal.Rptr. at 915. The *Terry* court, as have many other courts, felt itself unwilling to extend the right of privacy to parent-child communications, feeling such action was more appropriate if legislated, rather than mandated by a court. *Id.*

In a New York case, *In re A & M,* the Appellate Division was faced with a privacy claim for constitutional protection of communications from a child to a parent. *In re A & M,* 61 A.D.2d 426, 403 N.Y.S.2d 375 (1978). In that case the parents of a sixteen year old boy were issued a subpoena to testify before a grand jury investigating an arson, as to any admissions the boy might have made to his parents. At the trial level, the court granted a motion to quash, basing this action on the view that the communications between child and parent fell within New York's state law privilege protecting marital communications made in confidence. *Id.* at 428, 403 N.Y.S.2d at 377.

While the Appellate Division reversed the trial court's decision and refused to expand the marital privilege, the appellate court nonetheless concluded that "the integrity of the family relational interests is clearly entitled to constitutional protection." *Id.* at 432, 403 N.Y.S.2d at 380. The court undertook an analysis of the competing private and state interests. While the state's interest in obtaining full facts for the adjudication of the arson case was deemed "legitimate", the benefits to society should open, trusting and confidential communications between parent and child be preserved was also recognized. *Id.* Furthermore, the Court noted that the state's coercion of a parent into revealing a child's potentially incriminating statements which were spoken in confidence, "is shocking to our sense of decency, fairness, and propriety." *Id.* at 433, 403 N.Y.S.2d at 380. The court concluded that if the confidential information was revealed to the parents "for the sole purpose of obtaining support, advice, or guidance," then the state's interest in compelling the disclosure was outweighed by the benefit to society in fostering the relationship between parent and child. *Id.* at 435, 403 N.Y.S.2d at 381. However, the court held that the parents of the child would not be excused from testifying before the grand jury, but the scope of the interrogation would be limited to questions which would not invade the realm of family privacy. *Id.* at 436, 403 N.Y.S.2d at 382. Although the court fell short of specifically articulating a privilege for parent-child communications, the practical effect of their holding was to recognize a narrow privilege. *Id.* at 434-35, 403 N.Y.S.2d at 381. However, in footnote nine, the court did indicate that non-disclosure would be inappropriate where testimony by family members was voluntary. *Id.* at n. 9. In other words, the court would not act to prevent the voluntary testimony of a family member where confidences would be divulged.

A year later, the New York courts were again faced with a claim for a parent-child privilege for confidential, intrafamilial com-

munications. In *People v. Fitzgerald,* the court noted that it was a case of first impression, "whether there exists a 'parent-child' privilege which would prevent forced disclosure by the State of confidential communications between a parent and a child of any age when the parties to such communication mutually assert such a privilege." *People v. Fitzgerald,* 101 Misc.2d 712, 422 N.Y.S.2d 309 at 310 (1979). In response to the issue at bar, the court concluded that "such a privilege can and does exist, grounded in law, logic, morality, and ethics." *Id.* In *Fitzgerald* the 23 year old defendant was tried for criminally negligent homicide surrounding a hit-and-run traffic accident. The People subpoenaed defendant's father as a grand jury witness, in order to elicit from him allegedly incriminating statements made by his son to him concerning the accident. Subsequent to the father's appearance before the grand jury, the father's counsel moved to preclude the compelled testimony, the substance of which were the confidential communications from son to father, surrounding the accident. *Id.* 422 N.Y.S.2d at 310–11. In considering the claim of a parent-child privilege, the *Fitzgerald* court noted that "privileges are designed to protect relationships deemed socially desirable." *Id.* 422 N.Y. S.2d at 311. In a "balancing between conflicting social values .... [t]he social benefit to be derived·from the protected relationship is believed to outweigh the harm that results from exclusion." *Id.* Significantly, the court noted:

> [t]he tendency is not to extend the classes to whom the privilege from disclosure is granted, but to restrict that privilege (citation omitted) .... However, the courts cannot shield themselves behind such a "tendency" and disregard all such situations where the foundations of certain *basic* relationships, such as those between family members may be threatened.

*Id.* The court deemed the sanctity and privacy of the family to be fundamental rights, entitled to constitutional protection. *Id.* 422 N.Y.S.2d at 312. Further, the court noted that "[c]onfidential communications,

by their very nature, in order to foster the on-going confidential parent-child communications between parent and child, must *remain* confidential and private if the parties so desire, and be without the power of the state to inquire ... " (emphasis in original). *Id.* 422 N.Y.S.2d at 312. Citing the *In re A & M* case, *supra,* the Court opined that, "[i]t is inconsistent with the way of life we cherish and guard so carefully and raises the spectre of a regime which encourages betrayal of one's offspring. And if, as seems likely, the parents refuse to divulge their child's confidences, the alternatives faced by the parents, i.e. risk of prosecution for contempt for commission of perjury, could seriously undermine public trust in our system of justice." *Id.* The court held that a parent-child privilege flowed directly from rights granted in the United States Constitution, the Ninth and Fourteenth Amendments to the Constitution, as well as from the New York State Constitution, and that this privilege was within the ambit of the "right to privacy." *Id.* Furthermore, since the Court deemed that the privilege flowed directly from the constitutionally recognized "right to privacy", it viewed the question of the judicial recognition of a parent-child privilege as "a question of law which is appropriate for this court's decision, notwithstanding the lack of legislative recognition of such a fundamental right." *Id.*

In the *Fitzgerald* case, it was interesting to note that the child was no longer a minor, and had lived away from home for some years. *Id.* However, the son and father met and talked frequently, with the father providing the "normal father-son encouragement." *Id.* In discussing the child's age in regard to the recognition of a parent-child privilege, the court significantly noted:

> While it is true that the "fostering of a confidential parent-child relationship is necessary to the child's development of a positive system of values" ... it does not follow that this fundamental relationship can arbitrarily be said by the State to cease at the stroke of midnight on the last day of the child's seventeenth year.

*The parent-child relationship of mutual trust, respect and confidence, if it exists at all in the individual case, is one that should be fostered throughout the life of the parties.* Indeed, in many cases *the closeness of the family unit may well increase* as the child becomes an adult and realizes that the advice, encouragement and training by the parents had value and merit then and equal substance in later years. While the "minor" of seventeen years and the parent of forty may often be in disagreement on the values and lessons of life, *the "adult" of twenty-seven and the parent of fifty may well have enjoyed a resurgence of common values, ideals and mutual trust and respect for one another.* (emphasis added).

The court continued:

That such a relationship can indeed exist past the child's age of majority does not seem "absurd" to this Court. It is that very relationship, coupled with the confidential communication between the parties that such a parent-child "privilege", arising out of the right to privacy, can be said to protect. *The mutual trust and understanding, if such exists between the parent and child cannot be made subject to the intrusion of the State merely because of a proposed artificial barrier of age.* (emphasis added).

And the court concluded:

Not only do logical, ethical and moral considerations mandate the extension of such a fundamental right beyond any arbitrary age, but if, as this Court believes, such a parent-child privilege flows from the constitutional right to privacy inherent in such a relationship, *the State is forbidden under law to create such an artificial barrier as age to limit that right to certain persons only, due to the ongoing nature of such a relationship. . . . No other previously recognized privilege has as its basis a necessity of meeting a maximum or minimum age. It is the nature of the relationship and the nature of the communication which govern.*

*Id.* 422 N.Y.S.2d at 313–14. Based on its analysis, the court concluded that the parent-child privilege arises out of the constitutional right to privacy, that such a privilege does indeed exist, and that the privilege "may not and should not be limited by the age of either party asserting such claim." *Id.* 422 N.Y.S.2d at 314.

In a recent case, the Fifth Circuit was faced with a witness' refusal to testify before a grand jury in *In re Grand Jury Proceedings: Starr,* 647 F.2d 511 (5th Cir. 1981). In *Starr,* a grand jury was investigating the witness' mother and stepfather to inquire into their involvement in a homicide. Despite having been granted use immunity by the district court, the witness refused to testify before the grand jury. On appeal from an order of civil contempt, the witness argued that the use immunity was not an adequate protection of her Fifth Amendment privilege against self-incrimination. But what is relevant to the case *sub judice,* is the fact that the witness also based her refusal to testify against her mother and stepfather on the claim of a "parent-child" privilege. The Fifth Circuit rejected both reasons for her reticence, and affirmed the order of civil contempt. *Id.* at 512.

The *Starr* opinion is quite brief. In essence, the court summarily refused to delve into the issue of a "parent-child" privilege, referring to the lack of federal precedent for such as a justification. The court noted that "[w]e can find no federal judicial support for recognition of a "parent-child" privilege and decline to create one under the circumstances of the present appeal." *Id.* at 513. In a footnote, the court mentions that "scholarly evidentiary authorities" have been silent on the issue of such a privilege. *Id.* at n. 3. In another footnote, the *Starr* court conceded that New York state courts have recognized a parent-child privilege, citing *In re A & M,* and *People v. Fitzgerald,* both noted *supra.* While lodging no opinion as to the persuasiveness of the New York state court opinions for use in federal courts, the *Starr* court noted that "we can distinguish the cases on the basis that they involved confidential communica-

tions from the child to the parent, and were founded for the most part on the desire to avoid discouraging a child from confiding in his parents." *Id.* at n. 4. Apparently, the Fifth Circuit deemed the lack of precedent for the recognition of a parent-child privilege a sufficient bar to a further inquiry into the propriety of considering such a privilege as a novel, challenging issue which the courts were going to eventually be required to address. The *Starr* court felt that the facts of the appeal before them did not warrant stepping into unknown legal territory. This Court will assume no such timid posture. In the case at bar, this Court fails to see a sufficient basis for distinguishing the New York state cases, noted *supra,* on the basis of the "direction" from which communications between parent and child flow. The argument which the *Starr* court renders to distinguish these cases misses the point with which this Court wishes to deal. The fact that the New York cases "involved confidential communications from the child to the parent" and were largely based upon the avoidance of "discouraging a child from confiding in his parents" does not render these cases irrelevant to the issues before this Court. While the *Starr* court deemed them irrelevant to the facts of their case, this Court will rely on these cases as exponents of the notion of the reciprocity of parent-child communications, both confidential and otherwise. This Court will not narrow previous case law by observing it in a one-sided vacuum. Nor will I ignore well-reasoned legal arguments simply because they occurred within the framework of state court opinions. Because the issue *sub judice* is a new frontier in the area of testimonial privileges, and, I feel, an evolving point of law of significant gravity, I will seek guidance from the views of other courts, both state and federal, as well as scholarly opinion on the matter. The relationship between parent and child is precisely that: a relationship. It seems anomalous to conclude that while courts might not wish to discourage confidential communications from child to parent that, on the other hand, it *is* permissible to discourage confidential communications from parent to

child. The *Starr* distinction seems to indicate such a result. Such an analysis side steps the issue in this case as well as ignoring the reciprocal mutuality of the parent-child bond. Though such a bond might be intangible in both its depth and scope, it must not be undervalued because of the inability to quantify and explain it in objective terms.

The Ninth Circuit has recently dealt with the issue of a parent-child privilege. In the case of *United States v. Penn,* 647 F.2d 876 (9th Cir.1980), a majority of the Court of Appeals, en banc, reversed and remanded a district court suppression of a jar of heroin taken from defendant's back yard. The *Penn* case evolved from events which occurred when police entered the Penn residence pursuant to a valid search warrant to investigate Clara Penn, who was allegedly distributing heroin from her home. Evidence indicated that some of Penn's children were involved in the operation, and when a drug sale was to be made, Penn sent one of the children to obtain the drugs from a location in the back in which they were secreted. The search warrant was drawn to include the back yard, as well as the house. When the search was begun, approximately ten people were in the home, including Clara Penn's children. In executing the search warrant, police found a quantity of cocaine within the home. When Penn's young child, five year old Reggie, requested to go to the bathroom, a police officer accompanied the child. Still suspecting heroin on the premises, the police officer asked the child if he knew where it was hidden. The child nodded affirmatively. Later, when again alone with Reggie, the police officer asked Reggie if he would show the officer where the heroin was hidden. The child agreed, then hesitated. At this point, the police officer offered Reggie five dollars to locate the heroin. The child complied, and the police recovered a jar from the back yard which contained 132.9 grams of heroin. *Id.* at 878–79. The district court suppressed that part of the evidence which had been recovered with help from the child. The lower court viewed the

search as violative of the Fifth Amendment due process clause, noting:

'The bribery of a child of tender years by a policeman in order to obtain evidence to be used against a parent represents police conduct which is shocking to the conscience and is, in the opinion of this Court, so violative of the decencies of civilized conduct to be a deprivation of due process.' (citation omitted).

*Id.* at 879. The lower court based this view on a citation to *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) which involved the forcible insertion and use of a stomach pump.

In deciding the *Penn* case, the Ninth Circuit was hesitant to embrace the suppression issue on the grounds of a Fifth Amendment due process clause "fundamental fairness" argument. The court noted that "[o]nly the most serious cases, which truly shock the conscience, as well as the mind, call for invocation of the Constitution itself rather than our prudential powers." *Id.* at 880. The court discussed how the *Rochin* precedent had been limited to the physical assault of an individual, thus placing the *Penn* case outside of the lower court's reliance on that precedent. Finding the *Rochin* line of cases as one particular subset of due process violations (involving assault on the person), the Ninth Circuit conceded in their analysis that *Penn* could fall within the "broader category" of cases involving police investigative procedure during which a violation of due process has occurred. The court then applied the rationale of *Betts v. Brady,* 316 U.S. 455 at 462, 62 S.Ct. 1252 at 1256, 86 L.Ed. 1595, to analyze the due process arguments "by an appraisal of the totality of facts in a given case." From this analysis, they found that, "[u]nder the facts of this case, the tactic did not violate the Fifth Amendment; under the facts of another, it might." *Id.* at 880. It is significant to note both that the Ninth Circuit found the police investigatory conduct repugnant, as well as the fact that the court conceded the possibility of a violation of due process in a different factual context.

The court then discussed the fact that use of paid informants is standard procedure in police work. And, in regard to the use of information provided by family members to aid in conducting criminal prosecutions, the court noted:

[V]ery young children may aid criminal investigations; and sons may inform or testify against mothers .... A very young child may be given money in exchange for information about a non-family member; an adult son (or brother, or spouse) may be paid to inform against his mother, etc.; and a very young son may freely inform or testify against his mother .... If a mother's picture is on a reward poster and her very young son, having learned its import, offers to reveal to the police her hiding place, the police are not obligated to refuse to hear the information or to withdraw the reward offer as to the son.

*Id.* But rather than basing their opinion that there was no due process violation on the fact that the child was of tender years, was paid to inform, and was the son of Clara Penn, instead, the court concluded that there was no violation of due process based on certain facts which they deemed critical to their determination in the case before them. A sequential listing of these facts included:

4) *The police never threatened or badgered Reggie.*

5) The police did not trick or deceive Reggie.

6) The police conduct violated no law.

\* \* \* \* \* \*

8) *Before the bribe was offered, Reggie told the policeman he knew where the heroin was hidden,* and in fact, he did know.

9) Heroin dealing is an extremely serious crime, and the government's interest in discovering and punishing dealers is correspondingly strong.

(emphasis added). *Id.* at 881. And further, the court quite significantly noted its belief that the facts of the case before them, and the implications of the police conduct were

unlikely to be raised as issues before the court in the future:

> 10) It was not and *is not a regular practice* of the Seattle or any other police department to bribe young children to inform against their parents. *This was an isolated incident with minimal potential for repetition.*

(emphasis added). *Id.* The court then refers to criticisms of their holding, as discussed in Judge Goodwin's dissenting opinion in the case. Referring to Goodwin's view that the holding of the *Penn* majority "undermines the interests of preserving family units and the exchange of information within them," the court does concede that, "[f]rom the viewpoint of the individual, these interests may be significant ends in and of themselves." But although the court concludes that these are important interests, and may be "significant ends", the court juxtaposes against these interests the interests of society as a whole, dubbing the individual interests as "perhaps, primarily, important as means to a greater end." *Id.* at 881. The court then cites to the decision rendered by the Supreme Court in *Moore v. City of East Cleveland, supra,* 431 U.S. at 503–04, 97 S.Ct. at 1938 (plurality opinion), again, conceding to the sanctity of the family as a protectable institution in American life, in and of itself:

> 'Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural.'

Applying a *Betts v. Brady* consideration of "the totality of facts," the Ninth Circuit then observed that "[w]hen pondering how deeply our consciences are shocked by the police's intrusion into the Penn family's circle of confidence, we would not fulfill our duty . . . . unless we took into account what manner of family unit it was." *Id.* at 881. The court then discussed the fact that Clara Penn apparently utilized her children to aid in carrying out her narcotics sales. Drawing an analogy to *Blackford v. United States,* 247 F.2d 745 (9th Cir.1957), *cert. denied,* 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958), the Ninth Circuit deemed that it was Clara Penn herself who placed incriminating information in the child's mind in order to further her own schemes, and thus, she was in no position to complain of police methods of obtaining the information from the child. In choosing the lesser of two evils by weighing the relative degrees of "shockingness", the court viewed Penn's own behavior as the more detestable and therefore upheld the police conduct as permissible on the facts of that case. *Id.* at 882.

The court then discussed the "presumption of innocence" which Judge Goodwin, in his dissent, urged the majority to utilize by viewing the Penn family unit "not as a criminal one but as an innocent, protection-worthy one." The court refused to examine the guilt or innocence question, but chose to again focus on "the nature of the relationships within the Penn family unit." *Id.* As indicative of the nature of those relationships, the court placed great importance on the fact that, "before the bribe was offered Reggie had already told the policeman he knew where the heroin was hidden, thus rendering quite hollow any presumption of normal family roles and affairs." *Id.* Judge Goodwin had also urged the court to look at the future damage to the child's emotional and psychological composition which could occur by allowing information provided by him to be used in prosecuting his mother. Conceding that "permanent scars" and "irreparable psychological damage" could occur, the court subordinated this damage to the interests of society as a whole:

> Sadly, this [irreparable psychological damage] may be true. But when we consider the alternative, this possibility does not shock our consciences. Reggie might equally well suffer "permanent scars" and "irreparable psychological damage" from the reflection that his mother led him to spend his childhood spreading heroin and misery throughout

his community. On balance, we cannot affirm the suppression order.

*Id.*

In concluding their discussion of the Fifth Amendment due process issue, the court made a comment which is highly significant to the case before us now. The *Penn* court did not want to create an iron-clad precedent on the issue. To avoid this, they specifically limited their decision to the facts before them, believing the situation unlikely of repetition. They noted:

> It is urged to us that we should not limit our vision to the facts of this case, for a reversal of the suppression order here would lead to systematic government-programs to "persuade" young children to inform against their parents, as in the societies created by George Orwell and Adolf Hitler. *If we agreed with this logic, we would of course affirm the district court. We have no reason to believe, however, that this kind of information-gathering method is or will become anything remotely approaching standard procedure in any law enforcement community in the United States.*

(emphasis added). *Id.* What is so significant about the Ninth Circuit's comment is that it indicates recognition that should such a practice be allowed, and then systematically abused by the government, then a staggering violation of individual rights as well as a destructive impact on the family unit in society could result. This possibility was not to be ignored.

Penn's next argument was based upon her Fourth Amendment right to be free of unreasonable searches and seizures. The district court did not reach this argument, as they had suppressed the evidence on the Fifth Amendment challenge. The Court of Appeals rejected Ms. Penn's Fourth Amendment claim, finding the search "not constitutionally 'unreasonable.'" They found that Penn, herself, had suffered no violation of *her* "legitimate expectation of privacy." *Id.* The court, referring to the decision in *Rakas v. Illinois,* 439 U.S. 128, 139–40, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978) noted:

> [t]he inability of one person to assert the violation of another's Fourth Amendment rights is expressed not in terms of standing, but in the substantive terms of 'whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.' The police's interaction with ("search of", perhaps) Reggie, even if it was unreasonable, did not violate any legitimate expectation of privacy or other Fourth Amendment interest of Clara Penn.

*Id.* at 883. And significantly, the court went on to plant a seed for later fruitful inquiry, in noting that "[e]ven if somehow this was a 'search' of Reggie, that violated *his* Fourth Amendment rights, there was no violation of Clara Penn's Fourth Amendment rights." *Id.* The court clarified this position by concluding in a footnote that Penn "had no special Fourth Amendment interest in the confidence of her intrafamily communications that might have been violated by a 'search' of Reggie." *Id.* at 883, n. 8.

Finally the court examined Penn's claim that, in bribing Reggie, police violated substantive due process. Citing *Griswold v. Connecticut, supra,* she specifically urged that the bribe "intruded on a 'zone of privacy' comprising family life." *Id.* The court rejected this argument as well, concluding that:

> [t]his case does not involve the special intimacy characteristic of the areas of sexual relations and reproduction . . . nor does it involve any fundamental parental right . . . . Therefore, no "family" interest of constitutional stature is implicated here . . . . Moreover, past substantive due process cases based on "family interests" have all involved systematic regulation of the interest . . . .

*Id.* at 884. But the Ninth Circuit's most striking indication their attitude toward the "family interest" when subjected to systematic governmental regulation was the indication that they sincerely viewed the *Penn* case as an isolated incident, outside the realm of "systematic regulation". But the

court unequivocally stated that should facts come to light in the future which would indicate a systematic repetition of such information gathering tactics which infringe upon the constitutional rights of the family, the *Penn* court would be willing to re-examine the constitutional pronouncements of their holding in light of the grave constitutional questions which would spring forth from such repetition:

> Here we have only a single, isolated intrusion, with no apparent threat of repetition. *We choose to keep our constitutional powder dry against the day when we are shown that repetitions have occurred or even that this kind of conduct has become a regular police policy.*

(emphasis added). *Id.* at 884.

Having rejected all constitutional arguments, the Court of Appeals then discussed the possible non-constitutional grounds for suppressing the evidence. Although the court might wish to censure such police tactics, they felt the exercise of "supervisory" power was an inappropriate assumption of veto power. *Id.* And, the court likewise declined to interpret a privilege under the broad provisions of Rule 501 of the *Federal Rules of Evidence.* Articulating the standard to be applied for recognition of a privilege, as stated in the Rule itself, the court noted:

> Federal Rule of Evidence 501 declares that the existence and extent of privileges "shall be governed by principles of the common law as they may by interpreted by the courts of the United States in the light of reason and experience."

*Id.* at 884–885. And the court concluded, again specifically limiting their conclusion to the facts before them, that "[t]here is no judicially or legislatively recognized general 'family' privilege ... and we decline to create one here." *Id.* at 885.

The dissent in *Penn* was not only vocal, but persuasive. Judge Goodwin concurred in the majority view that the police conduct did not violate the due process clause of the Fifth Amendment; however, he did feel that the search violated the Fourth Amendment in that it was "unreasonable." Citing to *Olmstead v. United States, supra,* 277 U.S. at 478–79, 48 S.Ct. at 572, Goodwin noted that, "[t]his reasonableness requirement, with roots deep in American history, protects the individual's 'right to be let alone' against arbitrary, unjustifiable or unreasonable government intrusions." *Id.* at 885. Goodwin does concede that a balance must be struck between protection of the individual's interests versus protection of the interests of society as a whole:

> Of course, the right embodied in the Fourth Amendment is not an absolute right. It must "give fair leeway for enforcing the law in the community's protection." (citation omitted). Indeed, privacy must give way in many situations. No person would be secure in his or her person or property if the police were totally immobilized by judicial rules which weakened their ability to combat crime. Therefore, as in the case with many constitutional rights, the concept of reasonableness within the Fourth Amendment should afford "the best compromise * * * for accommodating * * * often opposing interests." (citation omitted).

*Id.* at 886. Goodwin then engaged in an analytical balancing of the severity of the crime in the case, as against the police conduct employed to obtain the challenged evidence. Significantly, he stated:

> Heroin trafficking is a serious crime. On the other hand, society also has an interest in the propriety of police tactics, regardless of the gravity of the offenses to be prevented. The government is not free to employ any means at hand to restrict heroin distribution. One goal of the Fourth Amendment is to protect the public from unnecessarily intrusive police searches. If the police behave in a manner which brings the law into disrepute, the resulting institutional damage to the government may be as socially undesirable as the crime the police combat.

*Id.* To Goodwin, then, there is a significant danger to society when government information-gathering is completely unfettered, to the derogation of the rights of individuals.

Judge Kennedy, who made dissenting comments, with which Judges Hug and Tang concurred, noted that "[t]he existence of the parent-child union and the fundamental place it has in our culture require no citation, but it is perhaps appropriate to note that courts have protected it where the threat of disruption is in some respects more attenuated than in the circumstances of the case before us." Judge Kennedy then cited to the Supreme Court's opinion in *Moore v. City of East Cleveland,* noted *supra.* He also stated:

I know for a certainty that none of my brothers sitting in this case would neglect for an instant their duty to protect essential liberties; I regret only that we have been unable to convince them that the case before us presents a question of this gravity. The assault on the parent and child bond is relentless and deliberate in many countries of the world, *see* Amnesty International, Children (1979), and to some observers the manipulation of the child and the injury to the relationship that occurred in this case may seem innocuous by comparison. I view the police practice here as both pernicious in itself and dangerous as precedent. *Indifference to personal liberty is but the precursor of the state's hostility to it.*

(emphasis added). *Id.* at 889. Judges Kennedy, Hug, and Tang all emphatically dissented from the majority opinion. Judge Fletcher, who dissented from the denial of a rehearing en banc, noted that the opinion of the majority, "is deeply troubling for reasons well expressed by my brothers Goodwin, Kennedy, and Ferguson. It ignores the body of case law emphasizing the significance of the family and expanding the zone of constitutional protection we accord the private sanctuary of family life." *Id.*

IV. *The Expansive Scope of Rule 501 of the Federal Rules of Evidence:*

In asserting his claim to a parent-child privilege, Movant urges that Rule 501 of the *Federal Rules of Evidence* as adopted, provides an expansive approach toward federal interpretation of testimonial privileges. In a law review article, dealing with precisely that issue, Professor Thomas Krattenmaker substantiates this view. *See* Krattenmaker, *Interpersonal Testimonial Privileges Under the Federal Rules of Evidence: A Suggested Approach,* 64 Georgetown L.J. 613 (1975/76). Krattenmaker defines a testimonial privilege as "a power, held by at least one participant in a confidential communication, to prevent a court from receiving testimony concerning that communication that otherwise might be sufficiently relevant and accurate to justify its introduction." *Id.* In discussing the history of the testimonial privilege, Krattenmaker notes:

Prior to 1975, neither Congress nor the federal courts played a significant role in the development of the American law of testimonial privileges; state legislators and local courts largely determined what privileges would be recognized. With the passage of the new *Federal Rules of Evidence,* Congress has given federal courts a statutory guide by which to measure privilege claims. In implementing this congressional guide, federal judges will have to confront directly policy problems that they have been able to avoid under previous practice.

*Id.* at 614. Krattenmaker then proceeds to advise courts of a suggested approach for interpreting interpersonal testimonial privileges in regard to confidential communications between natural persons.

In describing the atmosphere in which the Federal Rules of Evidence became part of American law, Krattenmaker notes that the *Rules of Evidence* sparked heated controversy among legal scholars and practitioners. Prior to the passage of the *Federal Rules of Evidence,* the Supreme Court of the United States promulgated a set of *Proposed Rules,* in 1972. See *Rules of Evidence for United States Courts and Magistrates,* 56 F.R.D. 183 (1972). Two years later, Congress, in response, adopted the *Federal Rules of Evidence,* which Krattenmaker notes differed quite substantially from the Supreme Court's *Proposed Rules.* Krattenmaker describes the controversial events which surrounded the passage of the *Federal Rules,* in noting:

The *Proposed Rules* promulgated by the Supreme Court, including a set of thirteen detailed privilege rules, contained no dissenting statements from members of the Advisory Committee on Rules of Evidence, which did the bulk of the drafting work, or the Committee on Rules of Practice and Procedure of the Judicial Conference, which formally supervised the Advisory Committee and advised the Supreme Court. Public statements by members of both groups clearly indicated, however, that each body was divided substantially on the privilege issue. After promulgation of the *Proposed Rules,* public dissension intensified and widespread hostility to the privilege portions of the *Proposed Rules* became a principle reason for congressional intervention. Congress ultimately resolved the issue by discarding the Advisory Committee's draft *in toto* and substituting for the proposed set of thirteen rules the two deceptively simple sentences of Rule 501:

> "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rules of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

*Id.* at 615–16. Prior to the passage of the *Federal Rules,* in hearings before the House subcommittee, there was an impressive array of vocal opponents to the privilege portions of the *Proposed Rules,* as promulgated by the Supreme Court. These opponents included former Supreme Court Associate Justice Arthur Goldberg, Judge Friendly and several prominent law professors, the

Association of American Physicians and Surgeons, the Washington Council of Lawyers, the Association of the Bar of the City of New York, the Reporter's Committee for Freedom of the Press, the American College of Trial Lawyers, the National Association of Mental Health, the American Library Association, the Communications Workers of America, the National Society of Public Accountants, the American Bar Association's Special Committee on Federal Practice and Procedure and the American Medical Association. *Id.* at 642. Krattenmaker notes that "an expansive view of Rule 501 rests on the premises that interpersonal testimonial privileges serve as important protectors of the right of privacy .... The historical evolution of federal evidence law and the legislative history underlying Congress' rejection of the *Proposed Rules* also support a more liberal attitude toward recognizing testimonial privileges." *Id.* at 616.

If the Supreme Court's *Proposed Rules* had been adopted, instead of the *Federal Rules of Evidence,* the law of testimonial privileges would be significantly different than it is today. For one thing, the *Proposed Rules* provided only two broad testimonial privileges, that for confidential communications between clergyman and penitent, as well as a privilege for confidential communications between attorney and client. The other privileges for confidential communications were significantly reduced. The former physician-patient privilege was narrowed to the scope of a psychotherapist-patient privilege, while the marital privilege was reduced solely to the sphere of criminal cases and was to be invoked only for the protection of the accused's rights. This was the entire scope of testimonial privileges under the *Proposed Rules.* Furthermore, Proposed Rule 501 provided that no testimonial privilege would be recognized if it was not contained in the Rules themselves or in an Act of Congress, or in the Constitution of the United States, and thus, no such privilege could be utilized in any federal court. *Id.* at 637. Krattenmaker notes that "[i]n addition to virtually

discarding more traditional privileges, the *Proposed Rules* would have wholly excluded recently developed privileges." *Id.* What is so significant to Krattenmaker is that Congress perceived the difficulties incident to an adoption of the Supreme Court's *Proposed Rules* of evidence, and consequently acted to prevent these Rules from being adopted. He notes:

> A storm of controversy arose after the Supreme Court promulgated the *Proposed Rules,* and no other portion of the Rules encountered more criticism than the article dealing with testimonial privileges .... The intense public controversy over these privilege provisions led Congress to take the unprecedented step of acting to prevent the Rules from becoming effective until Congress had given them plenary review. That action effectively transformed the Advisory Committee's *Proposed Rules* into little more than a preliminary congressional draft of a bill.

*Id.* at 638. The result of Congress' "plenary review" was a total rejection of the Advisory Committee draft. According to Krattenmaker, the subsequent enactment of Rule 501, "clearly reveals that Congress was motivated substantially by disagreement with the Advisory Committee's position that federal recognition of interpersonal testimonial privileges ought to be cut back." *Id.* at 639. He continues:

> Without engaging in collective psychoanalysis of members of the House subcommittee, one cannot say precisely why they initially determined to reject the Advisory Committee's approach wholesale. Clearly, one factor must have been the subcommittee's realization that the Advisory Committee's product was in no sense a compromise of various views held by the bar or the public. The range of testimony before the House subcommittee convincingly demonstrated that the Advisory Committee had a much narrower view of the utility of testimonial privileges than that of the general public or the practicing bar.

*Id.* at 642–43. It is not a stretch of the imagination, then, to conclude that the Advisory Committee's proposal to severely restrict the testimonial privileges for confidential communications available to individuals in federal courts was an extreme view, unwelcome to the bar and the general public.

Rule 501 of the *Federal Rules of Evidence,* subsequently enacted after the rejection of the *Proposed Rules,* declined to restrict testimonial privileges as they had developed up to that point. But what is perhaps even more significant is the fact that Rule 501 recognized and arguably even advocated the evolution of new testimonial privileges as they were deemed necessary by courts in the future. Krattenmaker noted:

> Prior to passage of Rule 501, federal courts that confronted claims of testimonial privilege had wrestled with a number of fundamental questions such as ... the extent to which judges ought to be receptive to innovative privilege claims justified on grounds of protecting personal privacy .... A candid assessment of legislative history compels the conclusion that Congress often chose to duck rather than resolve a number of issues of basic principles.

*Id.* at 645. In examining the legislative history behind the passage of the *Federal Rules of Evidence,* it is helpful to look at comments made by Congressman Hungate on the floor of the House, immediately preceding the passage of the bill. Hungate, who was the principle author of the *Federal Rules of Evidence,* discussed Congress' intent in their passage:

> The House rule on privilege is intended to leave the Federal law of privilege where we found it. The Federal courts are to develop the law of privilege on a case-by-case basis .... Rule 501 is not intended to freeze the law of privilege as it now exists. The phrase "governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience," is intended to provide the courts with the flexibility to develop rules of privileges on a case-by-case basis.

120 Cong.Rec. H 12253–54 (daily ed. Dec. 18, 1974) (remarks by Representative Hungate). Krattenmaker urges that, "the text of Rule 501 itself indicates, courts will have to consider the political and social policy issues that underlie the law of privileges in deciding claims of privilege." Krattenmaker, *Interpersonal Testimonial Privileges Under the Federal Rules of Evidence: A Suggested Approach,* 64 Georgetown L.J. 613, at 646 (1975/76).

## V. *Conclusion and Order:*

■ The expansive posture taken by Congress, in enacting Federal Rule of Evidence 501, allows this Court to analyze case law, scholarly opinion, and political and social policy issues in considering Movant's claim of a parent-child privilege. As a case-by-case development of the law of privileges is indicated in the legislative history of Rule 501, this Court is free to extend the present law of privileges to deal with those situations encountered in which constitutional protection is deemed essential. Having carefully considered the facts, law, and policy before this Court, it is my opinion that Movant's Motion to Quash Grand Jury Subpoena Ad Testificandum should be granted, for the following reasons.

There can be little doubt that the confidence and privacy inherent in the parent-child relationship must be protected and sedulously fostered by the courts. While the government has an important goal in presenting all relevant evidence before the court in each proceeding, this goal does not outweigh an individual's right of privacy in his communications within the family unit, nor does it outweigh the family's interests in its integrity and inviolability, which spring from the rights of privacy inherent in the family relationship itself. There is no reasonable basis for extending a testimonial privilege for confidential communications to spouses, who enjoy a dissoluble legal contract, while yet denying a parent or child the right to claim such a privilege to protect communications made within an indissoluble family unit, bonded by blood, affection, loyalty and tradition. And fur-

ther, if the rationale behind the privilege of a witness-spouse to refuse to testify adversely against his or her spouse in a criminal proceeding serves to prevent the invasion of the harmony and privacy of the marriage relationship itself, then affording the same protection to the parent-child relationship is even more compelling. The courts have upheld the right of a witness-spouse to claim the privilege not to be forced to be a witness against his or her spouse in a criminal proceeding. *See Appeal of Malfitano,* 633 F.2d 276, 280 (3d Cir.1980). In *Trammel v. United States,* the Supreme Court decided that the privilege against adverse spousal testimony remains a viable principle of federal law, and the Court only modified the privilege by vesting it solely in the testifying spouse. *Trammel v. United States,* 445 U.S. 40, 53, 100 S.Ct. 906, 914, 63 L.Ed.2d 186 (1980). This privilege applies to grand jury proceedings, as well. *Appeal of Malfitano, supra,* at 277; *United States v. Calandra,* 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). Applying this rationale to the case at bar, it is reasonable to hold that Charles Agosto may claim the parent-child privilege not only for confidential communications which transpired between his father and himself, but he may likewise claim the privilege for protection against being compelled to be a witness and testify adversely against his father in any criminal proceeding. The parent-child privilege, then, is based not only on the confidential nature of specific communications between parent and child, but also upon the privacy which is a constitutionally protectable interest of the family in American society.

Furthermore, the parent-child relationship exhibits similarities not only to the spousal relationship, which is based upon love and affection, but to the psychotherapist-patient relationship, which is based upon the guidance and "listening ear" which one party to the relationship provides to the other party. Open communication has a therapeutic value in the parent-child, spousal, and psychotherapist-patient settings. Because the law fosters the spousal

and psychotherapeutic relationships by affording a privilege in most instances, it is anomalous not to recognize a parent-child privilege, which exhibits characteristics of both of these relationships. Confidentiality is just as much a necessary prerequisite to the maintenance of the parent-child relationship as it is to these two privileged relationships.

Exclusionary rules and rules of testimonial privileges should never be considered as merely a frustration of the effective administration of justice or the circumvention of the best interests of society and the state. Rather, such rules insure that our system of justice functions at its optimal integrity, affording constitutional protection to each individual, who is a component of our great American society. While societies and even systems of government evolve throughout the ages, the family unit, as a repository of society's more important values, remains timeless in its function within each society and political structure. The importance of maintaining the integrity of that function is inestimable. And within our own democratic political setting in the United States, the notion of patriotism is based, in part, upon respect for authority and loyalty to God and country, as well as a sense of morals, ethics, decency and fair play. The family, as the basic unit of American society, is the milieu in which such values are inculcated into individuals, and thus into society as a whole. Consequently, the child learns to relate to society and have respect for society within the initial framework of his own relationship to his parents and other family members. To damage the parent-child relationship would result in damage to the child's relationship to society as a whole. In an age in which Americans bemoan the lack of loyalty or sense of responsibility which some family members seem to exhibit toward one another, resulting in massive government support programs, it is paradoxical that, on the other hand, the government would seek to employ information-gathering tactics which further undermine the integrity and supportive structure of the family unit. Thus, in placing the state's interests above concern for the individual's interest as a family member, and the interests of the family unit as a whole, the resultant deterioration of the very fabric of society, in an effort to effect the purposes of the state in "protecting society", is in the final analysis an exercise in futility. If the state drives a wedge between a man and his family, the state will ultimately suffer. The practical effect of allowing the government to coerce testimony by parent and child against one another is that individuals totally uninvolved in and innocent of the alleged wrongdoing will be jailed for contempt, solely because of a strong sense of family loyalty. The government, then, is essentially in a position of actively punishing selflessness and loyalty which are inculcated into the child by family, church, and even the state itself. It is inconsistent with a free society to place a child in the position of choosing between loyalty to his parent and loyalty to his state. In this instance, a child is delivered into a psychological double-bind in which he is scorned and branded as disloyal if he does testify and jailed if he does not. The child is required, then, to have a contingent loyalty to the family which reared him and taught him the basic values of honesty, integrity, and respect for authority.

If the government in its zeal to pursue law enforcement goals steps into the realm of constitutionally privileged relationships, the courts must intervene. In our democratic system of justice which is based in part on respect for the law, if the law places family members in a position of choosing between loyalty to a special, life-long bond as opposed to involuntarily testifying to confidential and private matters, then the law would not merely be inviting perjury, but perhaps even forcing it. The reticence to testify or the fabrications which family members would invent to protect one another would bring the government no closer to the truth it so zealously seeks.

And furthermore, our system of jurisprudence is based upon the presumption of innocence until proof of guilt is established. To be sure, some few guilty persons do "slip

through" the judicial system. But American law has consistently deemed the integrity of the judicial system's protection of individual rights to be worth this price. This can be analogized to the fact that some guilty family members may "slip through", but the integrity of the family unit must be maintained, even at that cost. And, as noted *supra,* the government would most likely be no closer to the truth, at any rate, should the courts be submerged in a plethora of perjury.

In this country, we are presently in the midst of a climate which fervently urges the apprehension and prosecution of criminal offenders. This is certainly a noble, and unarguably long-overdue social goal. But it is in precisely such a climate that courts must be careful not to hastily trade constitutional guarantees and fundamental rights which were hard-won by our founding fathers, in the speculative hope of bringing a few additional offenders to justice. The loss of these rights far outweighs the gain to society. Our constitutional roots sprang from a disgust for excessive governmental intervention into individual privacy, and the law should examine its origins in deciding any issue of such an important right.

Movant has urged that should a routine subordination of the family's privacy interests to the interests of the state become an accepted practice in American law, the result would be the substitution of a totalitarian state for a democratic state based on respect for freedom and privacy. He urges that American society has not yet reached the point that an individual's and a family's privacy interests are subordinate to the interests of the state. Nor does the individual in this country exist solely to further the purposes of the state. However, not every country shows the same deference for the high standards of family privacy and individual freedom and autonomy which Americans, through the Constitution and tradition have recognized as inviolable rights. In a recent article on the front page of the Los Angeles Times, Times Staff Writer Robert Gillette related the shocking story of a young Soviet hero who is celebrated for placing the interests of the State above loyalty to his family. *See* Robert Gillette, *The Informer: To a Russian, He's a Hero,* Los Angeles Times, September 11, 1982, at 1, col. 1. Gillette noted in part:

MOSCOW—In a revealing glimpse of Soviet concepts of morality, the official press here observed the 50th anniversary a few days ago of the death of Pavlik Morozov, a teen-age informer extolled as a heroic example for all young Communists.

Few Westerners would recognize the name, but Pavlik Morozov is a household word to Russians, who know his story from their schooldays as well as Americans know the legend of George Washington's felling of the cherry tree.

The difference is that in the morality tale of Pavlik Morozov, the son didn't run to his father to forthrightly admit his own misdeeds. Thirteen-year-old Pavlik ran instead to Communist Party officials in 1932 to denounce this father as an enemy of the state, an act that in Stalin's time was tantamount to signing his father's death warrant.

In retribution, according to the official version of the story taught in Soviet schools and youth organizations for half a century now, Pavlik's paternal grandfather and an older cousin murdered the young informer. They, in turn, were shot by a firing squad.

Pavlik's heroism is considered to lie in his exemplary fulfillment of the Communist Party's moral code, whose "guiding principle," according to the Large Soviet Encyclopedia, is "devotion to the affairs of communism and love of the socialist motherland."

Having placed his loyalty to party and state above loyalty to his family, the youthful Pavlik became a "martyr to the idea" of communism, the newspaper Selskaya Zhizn (Rural Life) said in a memorial commentary. The newspaper quoted the Stalinist writer Maxim Gorky's injunction that Pavlik's name "must not disappear" from the consciousness of Soviet youth.

\*　　\*　　\*　　\*　　\*　　\*

The legend of Pavlik Morozov has served the state as an instrument for legitimizing the informer as an acceptable, even vital institution in Soviet society. It is a legend, the youth newspaper Komsomolskaya Pravda observed, "which the child carries into (adult) citizenship. Pavlik Morozov helps the child understand that with this new step in his biography, he becomes a person obliged to make decisions, to struggle, and, if necessary, to carry out heroic deeds."

The legend's influence on Soviet society is hard for a foreigner to judge. Intellectuals poke fun at it in the privacy of their apartments, but informers and their denunciations still play an important role in daily life here. Informing is widely, if discreetly, viewed as a way to ingratiate oneself with the authorities and get ahead in life.

\* \* \* \* \* \*

This willingness to inform on friends, neighbors, co-workers and even relatives probably stems in part from a strong communal consciousness—a sense that everyone's business is everyone else's business—that is deeply rooted in Russian culture and long predates the advent of the Communist Party. *It is not for nothing that the Russian language lacks a word directly equivalent to privacy.*

(emphasis added). This story sadly indicates that a government can intrusively and devastatingly interfere with the loyalty of family members toward one another and the privacy of the family unit itself.

Turning to a discussion of the cases in which a parent-child privilege has been asserted, it seems that the claim of such a privilege usually arises where a parent asserts a right not to have to testify against his child, who has confided in him. This Court sees no reason to draw a distinction, affording protection for a child's communications to his parent, while yet affording no protection for a parent's communications to his child. As noted *supra,* what the privilege protects is not only the expectation of privacy in confidential communications (and thus the encouragement of such confiden-

tial communications) but also the privacy of the family relationship itself, and the right of the family to maintain its inviolability and integrity. Because of this dual aspect of a parent-child privilege, and the fact that it springs from a relationship which is both mutual and reciprocal, it would be logically inconsistent to allow the coerced testimony of *either* parent or child against the other. It would be unjust for society to teach that while a child should listen to his parents, he does so at the risk of being required to testify against them. In this regard, the liberty and privacy interests of the parent and child coalesce into a privilege which affords protection to both.

In *In re Kinoy, supra,* the court determined that Kinoy had to appear before the grand jury and give his testimony. To a great extent, this was based on the fact that his daughter was not the subject of a grand jury investigation. Unlike the *Kinoy* case, this Court deems that there is a significant relation between the grand jury investigation of Movant's father and the infringement of privacy rights. And unlike *Kinoy,* this relation is not so tangential as to permit the grand jury to call Charles Agosto as a witness against his father. Rather, because of the direct relationship, it is only proper that this Court order that he not be called.

In *In re A & M, supra,* while the parents were not excused from testifying before the grand jury, the scope of inquiry was limited to those areas which would not invade the realm of family privacy. In *People v. Fitzgerald, supra,* the parties mutually asserted a parent-child privilege which was upheld by the court. The *Fitzgerald* court wisely recognized that the privilege attached to communications made by a child of *any* age. In *Fitzgerald,* the seeds were planted for what this court deems to be the basis for the recognition of a parent-child privilege, i.e., that the nature of the communications between parent and child demands protection, but even beyond that, the nature of the relationship and the privacy inherent in the family unit itself command constitutional protection. In recognizing that the

parent-child privilege, like all other testimonial privileges, was not to be confined to certain minimum or maximum age limits, the *Fitzgerald* court gave dignity to the fact that the relationship is on-going, life-long, and incapable of being restricted by artificial barriers and technical legal definitions.

On the basis of the *Fitzgerald* holding, as well as the previously discussed cases, it can certainly be argued that a child would undergo great psychological stress by the State's forced betrayal of his confidences to his parents. But likewise, a child could undergo just as severe a psychological stress, if forced to betray a parent who has provided love, support, and sustenance. With *Fitzgerald,* the recognition of the reciprocity and mutuality of the parent-child relationship, at *all* ages of the participants, gives credence to the notion that irreparable psychological stress and harm will occur no matter which party is forced to betray confidences and expose family members to prosecution. The selfless love and altruism not only flow from parent to child, but likewise can flow from child to parent, in even more of a compelling way.

A son feels, perhaps, even a greater duty to listen to the confidences of his father, in that his perceptions of himself as his father's confidante is a powerful step in the growth process and the feeling of mutuality and respect within the relationship. The son is allowed to respond supportively to the father and return some of the foundational support which has been showered upon the son throughout his formative years. It can even be argued that there is a role reversal in the parent-child relationship, as the parent grows older and becomes more reliant on the child. In this regard, the parent becomes a child, once again, and the child assumes the role of a parent and protector of his aging parent.

With the mutuality of the relationship in mind, the absurd result of requiring parent and child to testify against one another would be that children would be afraid to listen to their parents, and vice versa, for any communications would be subject to government inquiry, and could subject the child or parent to either perjury, contempt, or familial scorn. It would be hard to imagine anything which could more effectively destroy confidence and communication within the family unit. Free interchange of ideas is how the parent-child relationship develops, and if this is cut off, the family unit completely dissolves and is replaced with a disjointed group of individuals, who while sharing the same household, remain subject to the controls of an omnipresent state, capable of intrusion into the minutest details of human relationships.

And in addition, in regard to *Fitzgerald,* because the issue before the court was of constitutional dimensions, the lack of a legislative pronouncement recognizing a parent-child privilege was deemed unimportant to that court. Here again, where fundamental rights are involved, the courts may rightly intervene to protect them. In keeping with the policy of *Fitzgerald,* as well as the expansive posture of Federal Rule of Evidence 501, this Court may likewise appropriately deal with such constitutional issues and afford protections where deemed necessary.

Finally, the *Penn* case from our own circuit, as discussed *supra,* can be squarely distinguished on many points from the case *sub judice.* The distinction occurs in at least three respects. First, the child, Reggie, voluntarily provided the information that he knew where the heroin was hidden, even before being offered a bribe by police. Secondly, the child was never threatened by police with any adverse consequences for his refusal to comply. And thirdly, the court in *Penn* clearly indicated its belief that such an incident was isolated and incapable of repetition.

The first two criteria on which *Penn* can be distinguished go to the voluntariness of disclosures by child against parent. There was no question in *Penn* that the child's actions and disclosures were voluntary, in that they were not made in response to any threats or coercion by police. The *Penn* court extensively discussed how law enforcement officials are free to use paid in-

formants, even paid family members, to gather evidence against individuals. But the difference between the use of a paid or voluntary informant, as in *Penn,* versus a threatened or coerced informant, as in the case at bar, is a critical distinction. While this Court will lodge no opinion as to the repugnance of family members voluntarily testifying against one another, it has not escaped my notice that the Ninth Circuit, in allowing the child's voluntary actions to stand as legal, nonetheless expressed censure and repugnance that law enforcement officials would place a child in such a position. It remains a fact that, to a great extent, the *Penn* court based its holding on the belief that the child's disclosure was voluntary. One can only imagine that the Ninth Circuit's repugnance would have intensified to outrage had the police officers forced the child, by threat and coercion, to offer evidence against his mother.

The third distinction of *Penn,* the "isolation" criterion, is definitely inapplicable to the case *sub judice.* As Movant has pointed out, as of the filing of the instant motion on July 7, 1982, Movant was the third individual in the previous eighteen months to be called and compelled to testify against a parent in a grand jury proceeding in the District of Nevada. By affidavit and exhibits attached to the instant motion, Movant asserts that on December 16, 1980, Kim Marshall was called to testify against her mother pursuant to a grand jury investigation of her mother. Likewise, on February 1, 1982, Scott Cantor was called to testify against his father, pursuant to a grand jury investigation of his father. The persistence of the government in pursuing this means of using family members to obtain information on grand jury targets is totally without the bounds of *Penn's* "isolation" criterion, and thus, brings to mind *Penn's* indication that repetition of such governmental activities would justify a reexamination of the issue. Although the Ninth Circuit chose to "keep its constitutional powder dry", that reticence was based on the sincere belief that such governmental intrusion into the family unit was an isolated incident. But the *Penn* court carefully refused to broaden its holding beyond the facts before them. On the contrary, the facts before this Court indicate that the potential for abuse remains, that my holding is consistent with the concerns expressed by the Ninth Circuit in *Penn,* and that my holding is not only constitutionally substantiated, but indeed, mandated.

Finally, in the Ninth Circuit's discussion of the Fourth Amendment issues in *Penn,* the court indicated that Reggie, as the repository of the information which the police sought, might have suffered a violation of *his* expectation of privacy, by virtue of the police conduct. Of course, the court was not free to pursue this possibility, because the mother, not the child himself, had claimed a violation of Fourth Amendment rights. Unlike the *Penn* case, Charles Agosto does object on his own behalf to the forced disclosure of evidence against his parent. In an analogy to the case at bar, it is not unreasonable to argue that Charles Agosto, as the repository of information which the government seeks, is the holder of a "legitimate expectation of privacy" in that information, and thus may not be forced to testify as to such information. Unlike the *Penn* case, in the case before this court, it is the *child* who is claiming rights of privacy, which the Ninth Circuit has indicated in *Penn* is a viable route to take.

This Court, in past decisions, has protected the inviolability of family privacy as a fundamental right. In *Darlene Brown, et al. v. The Honorable Addeliar D. Guy, et al.* 476 F.Supp. 771 at 773 (D.Nev.1979) this court noted:

> The family has been traditionally recognized by society as the most basic human and psychological unit, and when the state intrudes with its vast resources in an attempt to disassemble that unit, then every safeguard under the law must be abundantly exercised by the Court to guarantee that the inherent imbalance of experience and expertise between parent and state is minimized to the greatest extent humanly possible.

In a situation where the individual is placed in a position of choosing between loyalty to his family and loyalty to the state, it is entirely appropriate for courts to intervene and foreclose such a "Catch-22" situation. As Franklin noted in *The Encyclopediste Origin and Meaning of the Fifth Amendment,* in discussing the early continental rule that all information must be disclosed:

> The ferocious legislation which first enacted this law, demands . . . the sacrifice of all feelings of nature, of all sentiments of humanity; breaks the ties of gratitude and honor; makes obedience to the law consist in a dereliction of every principle that gives dignity to man, and leaves the unfortunate wretch, who has himself been guilty of no offence, to decide between a life of infamy and self-reproach, or a death of dishonor. Dreadful as this picture is, the original is found in the law of accessories after the fact. If the father commits treason, the son must abandon [the country] or deliver him up to the executioner. If the son be guilty of a crime, the stern dictates of our law require that his parent . . . should barbarously discover his retreat . . . . *[Thus] men are required to be faithless, treacherous, unnatural and cruel, in order to prove that they are good citizens, and worthy members of society.*

(emphasis supplied). Franklin, *The Encyclopediste Origin and Meaning of the Fifth Amendment,* 15 Law. Guild Rev. 41, 46 (1955) (quoting Livingston, *A System of Penal Law for the State of Louisiana,* 14 (1833).

And as a final note, the words of Judge Kennedy in his dissenting remarks in *Penn* ring true to the facts of this case:

> Indifference to personal liberty is but the precursor of the State's hostility to it.

Accordingly, it is hereby ordered that the Motion to Quash Grand Jury Subpoena Ad Testificandum, filed by Witness Charles Agosto, on July 7, 1982, is hereby granted.